## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Benjamin Zarn, <br><br> Plaintiff, <br><br> v. <br><br> Minnesota Department of Human Services, <br><br> Defendant. | Court File No. 22-cv-1756 (MJD/DJF) <br><br><br> **PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

Defendant Minnesota Department of Human Services (MDHS) admits Plaintiff Benjamin Zarn (Zarn) had religious objections to its COVID-19 mandate. MDHS claims that Zarn failed to inform it of his religious beliefs, but Zarn in formed MDHS on three separate occasions about his concerns, once specifically enunciating his religious beliefs. Union President Ryan Cates brought Zarn's religious conflict to MDHS, but MDHS informed Cates that it would refuse to give any religious accommodations to its COVID-19 mandate.

For MDHS to exempt itself from the duty to reasonably accommodate Zarn's religious beliefs, MDHS would have to show accommodation would have resulted in an "undue hardship." In *Groff v. DeJoy*, the Supreme Court clarified the "undue hardship" standard means a burden is substantial in the overall context of an employer's business. The Supreme Court rejected some circuits' *Trans World Airlines v. Hardison* dicta that took the "undue hardship" standard to mean only "more than *de minimis* cost."

## II.    STATEMENT OF ISSUES

1. Do the facts in the record show that Zarn was discriminated against because of his religious beliefs when he notified MDHS at least three times about conflicts with MDHS's COVID-19 mandate, and MDHS did nothing to learn more about his beliefs or attempt to accommodate his beliefs?

2. Do the facts in the record show that MDHS's COVID-19 mandate was an unlawful medical examination under the ADA when there was no legitimate reason to require Zarn to test for COVID-19 but not all other employees?

## III.    STATEMENT OF THE RECORD

1. Declaration of Benjamin P. Lanari in Support of Plaintiff's Memorandum in Response to Defendant's Motion for Summary Judgment, with Exhibits 1-18.

2. Declaration of Plaintiff Benjamin Lee Zarn in Support of Plaintiff's Memorandum in Response to Defendant's Motion for Summary Judgment, with Exhibits A-L

## IV.    STATEMENT OF FACTS

Zarn has been working at MDHS as a Forensic Support Specialist since August 8, 2018. Lanari Decl. Ex. 1, Zarn Dep. 10:14-16, 11:17-19.

### A. MDHS implements its COVID-19 mandate in August 2021.

On August 11, 2021, MDHS informed Zarn that its mandatory COVID-19 policy, which required COVID-19 vaccination or testing, would become effective September 8, 2021. Lanari Decl. Ex. 6. MDHS's policy is contrary to Zarn's religious beliefs. Zarn cannot in good faith take the vaccine or be subjected to discriminatory practices because

doing so would be against his moral conscience. Zarn Decl. ¶¶ 2-5. Zarn cannot receive the COVID-19 vaccine and he cannot submit to forced testing that is targeted at unvaccinated religious individuals. *Id.*; Lanari Decl. Ex. 6; Lanari Decl. Ex. 7; Lanari Decl. Ex. 1, Zarn Dep. 48:7-61:8 (explaining Zarn's religious objection to COVID-19 vaccination and testing, its root in conscience, God-given immunity, natural immunity, and the structure of Zarn's organized religion, Catholicism); Lanari Decl. Ex. 1, Zarn Dep. 61:6-7 (Question: "So would you consider that a religious objection to testing?" Answer: "Absolutely."); Lanari Decl. Ex. 1, Zarn Dep. 82:1-100:17. (Zarn explaining at length the hierarchy of the Catholic Church, the importance of the Catholic Church's teachings, and the central importance of a properly formed conscience that "tells us what is right and wrong, and [Zarn] is morally obligated to listen to that voice because if [he doesn't], then it's sin, and in some cases it can be gravely sin."); Lanari Decl. Ex. 1, Zarn Dep. 85:5-86:2 (Zarn explaining that conscience is the same as God speaking: it is God's law.) . *see also* Zarn Decl. Ex. A (Catholic bishop stating "We understand that some individuals have well-founded convictions that lead them to discern they should not get vaccinated.").

MDHS's COVID-19 mandate was in conflict with Zarn's religious beliefs. MDHS required Zarn to fill out its COVID-19 mandate form, as a condition of employment, and MDHS coerced Zarn to choose to either receive the COVID-19 vaccination against his will or be tested against his will. Zarn Decl. Ex. B; Lanari Decl. Ex. 8; Lanari Decl. Ex. 9; Lanari Decl. Ex. 1, Zarn Dep. 37:22-40:19 ("It's either refuse and get terminated or get discriminated against and keep my job."); Lanari Decl. Ex. 1, Zarn Dep. 45:1-10 ("I did

not give my full consent, my free and full consent. […] Because I was prohibited by my moral conscience to do so. And, again, my moral conscience is what God gave me."). MDHS had a COVID-19 vaccine mandate: either receive a COVID-19 vaccination, or submit to regular testing; there was no third option. MDHS did not give Zarn any option to request religious accommodation, or make any efforts to accommodate Zarn. *Id.*

MDHS rescinded its COVID-19 policy on May 24, 2022. Zarn Decl. Ex. E; Lanari Decl. Ex. 10.

**B. MDHS pressures its employees to receive COVID-19 vaccines and harasses employees who remain unvaccinated.**

MDHS sent out announcements to harass its employees to try to get them to receive COVID-19 vaccinations. Zarn Decl. Ex. D (January 10, 2022).

MDHS also required its staff to be COVID-19 vaccinated in order to take advantage of paid administrative leave. Lanari Decl. Ex. 11 (September 29, 2021); Lanari Decl. Ex. 12 (June 14, 2022); Zarn Decl. Ex. F (June 30, 2022). MDHS ignored that some individuals, including Zarn, have religious beliefs that prevent them from receiving the COVID-19 vaccine. On February 17, 2022, MDHS clarified that, under its COVID-19 policy, employees may be paid administrative leave *only* if they had been able to receive the COVID-19 vaccine ("COVID-19 Pay"). Zarn Decl. Ex. G. On February 18, 2022, Zarn filed a complaint for a hostile work environment, and MDHS acknowledged the complaint via email on February 22, 2022. Zarn Decl. Ex. H; *see also* Zarn Decl. Ex. I. Subsequently, On March 4, 2024, MDHS again clarified that the only persons who

were eligible to be paid COVID-19 Pay were individuals who receive the COVID-19 vaccine. Zarn Decl. Ex. J.

**C. Zarn informed MDHS of the conflict between his religious beliefs and MDHS's policy at least three separate times to express his concern with MDHS's discriminatory practices and at least once of his specific religious conflict with the MDHS COVID-19 policy.**

Zarn testified he requested a religious accommodation to testing. Lanari Decl. Ex. 1, Zarn Dep. 61:9-11. Zarn spoke with three separate people. Lanari Decl. Ex. 1, Zarn Dep. 67:20. Zarn also communicated ADA related concerns to MDHS and HR. Lanari Decl. Ex. 1, Zarn Dep. 75:19-79:10.

Robbie Bach has been supervisor at MDHS since 2005. Lanari Decl. Ex. 2, Bach Dep. 14:18-23. Bach has known Zarn since he has been employed at MDHS, and Bach was Zarn's first supervisor. Lanari Decl. Ex. 2, Bach Dep. 20:11-24. Bach testified she had known about Zarn's religious affiliation since he had taken religious holidays off in the past. Lanari Decl. Ex. 2, Bach Dep. 43:13-24. Consequently, Bach was involved in working with HR to get Zarn's religious holiday requests approved. Lanari Decl. Ex. 2, Bach Dep. 43:13-24. Zarn discussed his concerns with MDHS's COVID-19 policy, and Bach directed him to HR. Lanari Decl. Ex. 2, Bach Dep. 44:8-24. Bach testified she did not dig deeper about why Zarn thought MDHS's policy was discriminatory and unfair, and could not recall the specific conversation. Lanari Decl. Ex. 2, Bach Dep. 73:14-74:13. Bach also testified that, in hindsight, she should have asked Zarn for more clarification. Lanari Decl. Ex. 2, Bach Dep. 74:4-13.

Zarn testified that he "went to [] union president [Ryan Cates] and asked him to bring [his religious concerns] up to [the MDHS] executive management team where [Cates] work[ed] to ask and see if [Zarn] could have a religious exemption from the testing." Lanari Decl. Ex. 1, Zarn Dep. 61:12-17. Cates had worked at MDHS for over 17 years, as a security counselor lead. Lanari Decl. Ex. 3, Cates Dep. 6:11-23. Cates has been working in union management since 2012, and as president of the union since 2018. Lanari Decl. Ex. 3, Cates Dep. 8:6-8. By February 18, 2022, Union Representative Ryan Cates had relayed Zarn's objections MDHS policy to MDHS management, but MDHS management informed Cates that MDHS only allowed religious exemptions to COVID-19 vaccination but not COVID-19 testing. *See* Zarn Decl. Ex. K. Consequently, Cates told Zarn that MDHS would "allow exceptions from the [COVID-19] vaccine but not the [COVID-19] testing." Lanari Decl. Ex. 1, Zarn Dep. 61:12-20. In Zarn's experience, MDHS would not reliably respond to employees who were low on the hierarchy in direct care, so the best way for Zarn ensure that his concerns were heard was by having his concerns relayed through the union president to MDHS management. Lanari Decl. Ex. 1, Zarn Dep. 61:21-62:11.

Cates had spoken with MDHS management about MDHS's COVID-19 mandate. Lanari Decl. Ex. 3, Cates Dep. 9:1-10:3, 11:13-16. MDHS's COVID-19 mandate was not bargained for with the union, but it should have been discussed with the union because "all terms and conditions of employment should be negotiated with the union." Lanari Decl. Ex. 3, Cates Dep. 10:4-11:1, 12:19-23. Cates was not involved in any

6

communications related to MDHS's adoption and implementation of MDHS's COVID-19 mandate. Lanari Decl. Ex. 3, Cates Dep. 12:24-13:6.

Cates relayed Zarn's questions about religious exemptions to MDHS management, and asked MDHS management whether it provided religious exemptions. Lanari Decl. Ex. 3, Cates Dep. 17:20-18:25. Cates was told by MDHS that there were no religious exemptions to the testing prong of MDHS's COVID-19 mandate. *Id.* Cates communicated MDHS's response back to Zarn: that MDHS allowed for religious exemptions to COVID-19 vaccination but not to COVID-19 testing. Lanari Decl. Ex. 3, Cates Dep. 20:8-15. Cates did not find it unusual that Zarn asked Cates to relay Zarn's concerns to MDHS management, because the union is the voice of its members. Lanari Decl. Ex. 3, Cates Dep. 19:11-21. Cates testified it was sometimes difficult for employees to have their concerns heard by MDHS. Lanari Decl. Ex. 3, Cates Dep. 19:22-20:7. Cates also testified that if Zarn reached out to Minnesota Department of Human Resources (MDHR), HR, and his union representative about the lack of religious exemptions to testing, Cates did not know what else Zarn could have done. Lanari Decl. Ex. 3, Cates Dep. 25:13-18; *see also id.*, Cates Dep. 27:19-28:1 (Cates also mentioned the only other thing he could think of that Zarn could have done is seek a mandate from EOAD).

Cates is dependable and makes union members' concerns heard by MDHS management. Bach testified that if Cates were personally made aware of a religious objection by one of his union members, that "he would tell the employee to go to HR or work with HR on that." Lanari Decl. Ex. 2, Bach Dep. 55:10-56:6. Bach also testified that, in her experience, Cates would reach out directly to HR as union president. Lanari

7

Decl. Ex. 2, Bach Dep. 58:2-18. Similarly, Kuhlman testified she had never been in a situation in which she thought Cates seemed untrustworthy. Lanari Decl. Ex. 5, Kuhlman Dep. 11:11-12:17. Kuhlman also testified that she would believe Cates if Cates had testified under oath that he had informed someone in HR about Zarn's request for religious exemption from COVID-19 testing. Lanari Decl. Ex. 5, Kuhlman Dep. 11:11-12:17.

After Zarn heard the MDHS was not providing religious accommodations to testing, Zarn tried other avenues to get his concerns heard. Lanari Decl. Ex. 1, Zarn Dep. 61:21-62:11. Zarn did not see any point in pursuing a religious accommodation request that MDHS stated it would not give. Zarn Decl. ¶¶ 7-13. On August 17, 2021, Zarn contacted Minnesota Management and Budget (MMB) Commissioner Jim Schowalter about his concerns with MDHS's COVID-19 policy. Zarn Decl. Ex. L. On August 18, 2021, Cathy Hockert from MMB followed up with Zarn. *Id.* After the email exchange, Zarn followed up and filed a hostile work environment complaint with HR, filed a discrimination report with DHS, and also utilized a third route to notify MDHS of his concerns with its COVID-19 policy. Lanari Decl. Ex. 1, Zarn Dep. 63:18-64:2, 64:24-65:18.

### D. Zarn went followed MDHS when Zarn informed MDHS of the conflict between MDHS's COVID-19 and Zarn's religious beliefs.

Zarn's supervisor Bach testified that all the staff at MDHS, including HR, were aware of their obligation not to discriminate against any of their employees based on their religion. Lanari Decl. Ex. 2, Bach Dep. 62:20-24. Bach testified that it was permissive,

but not required, to request facilitated conversation through the Equal Opportunity and Access Division (EOAD) of the Office for Equity, Performance, and Development (OEPD). Lanari Decl. Ex. 2, Bach Dep. 67:19-68:2 (referring to Lanari Decl. Ex. 14). Bach also testified that an employee could have a complaint, and not contact the EAOD of the OEPD. Lanari Decl. Ex. 2, Bach Dep. 69:23-70:13. Bach also testified that an employee could file a complaint outside of the department entirely or through other legal channels. Lanari Decl. Ex. 2, Bach Dep. 70:14-24.

Union president Cates also testified that an employee *could* attempt to resolve issues informally, but it was not a requirement. Lanari Decl. Ex. 3, Cates Dep. 30:19-31:10 (emphasis added). Cates also testified that Zarn followed MDHS's policy, if Zarn filed "a discrimination complaint with the Minnesota Department of Human Rights, the Equal Employment Opportunity Commission, or through other legal channels." Lanari Decl. Ex. 3, Cates Dep. 31:11-24.

Patrick Patterson is a human resources classifications consultant for the State of Minnesota. Lanari Decl. Ex. 4, Patterson Dep. 6:19-22. Patterson also testified that an employee *could* attempt to resolve issues through any of the four methods under MDHS policy. Lanari Decl. Ex. 4, Patterson Dep. 18:11-19:3. Patterson also testified that it was allowed for an employee to contact OEPD EOAD to file a formal complaint, but it was not a requirement. Lanari Decl. Ex. 4, Patterson Dep. 19:8-15. Patterson also testified that an employee would be following the policy if the employee filed a complaint outside MDHS with the EEOC or MDHR. Lanari Decl. Ex. 4, Patterson Dep. 20:3-15. Patterson

also testified that it was the responsibility of an employee's supervisor to bring claims by employee's to the OEPD EAOD. Lanari Decl. Ex. 4, Patterson Dep. 21:3-11.

Allison Kuhlman worked at the State of Minnesota from December 2015 to June 2023. Lanari Decl. Ex. 5, Kuhlman Dep. 7:17-8:11. Kuhlman worked in human resources at different levels: "a human resources 1, a human resources 2, a human resource specialist 3, a human resource consultant, and then a human resource director." Lanari Decl. Ex. 5, Kuhlman Dep. 7:24-8:2. Kuhlman also testified that an employee could follow any of four informal complaint procedures, and that an employee could, but was not required, to contact the EAOD of the OEPD and file a formal complaint. Lanari Decl. Ex. 5, Kuhlman Dep. 14:10-15:5. Kuhlman also testified that an employee could comply with MDHS's policy by filing a complaint with either the EEOC or the Minnesota Department of Human Rights. Lanari Decl. Ex. 5, Kuhlman Dep. 15:6-18. Bach testified that all supervisors were required to report any complaint to the EAOD of the OEPD. Lanari Decl. Ex. 2, Bach Dep. 70:25-72:1. Bach also testified that an employee need not use certain "buzz words" to complain. Lanari Decl. Ex. 2, Bach Dep. 73:8-13. Similarly, Kuhlman testified that it is the responsibility of supervisors to report any alleged discrimination, harassment, or retaliation, and it would be a violation of the policies of the State of Minnesota if a supervisor failed to act on a received complaint. Lanari Decl. Ex. 5, Kuhlman 15:25-26:24.

In her HR role, Allison Kuhlman testified that if an employee had a religious concern she would notify the EOAD, or work with the concerned employee to get in touch with that division. Lanari Decl. Ex. 5, Kuhlman Dep. 6:16-7:4; 19:5-16.

**E. MDHS has non-discrimination policies that it failed to follow.**

MDHS has a Reasonable Accommodation Policy, which requires its supervisors to reasonably accommodate religious beliefs. Lanari Decl. Ex. 13. This policy adds additional obligations for MDHS to follow than its existing obligations under Title VII. Similarly, MDHS also has a Discrimination, Harassment and Retaliation policy," which protects against discrimination, harassment, and retaliation, and adds additional obligations for MDHS than its existing obligations under Title VII. Lanari Decl. Ex. 14.

**F. MDHS COVID-19 mandate was ineffective and discriminatory.**

MDHS claimed that it was forced to implement the policy because of how dangerous COVID-19 was. Zarn Decl. Ex. C. However, the factual record shows that MDHS's policy was both self-contradictory and ineffective. MDHS has provided absolutely no evidence during discovery that unvaccinated persons are more likely to contract or transmit COVID-19 than vaccinated persons. Furthermore, MDHS's policy of testing only for COVID-19 in unvaccinated persons was ineffective, since it could be 12-14 days in-between tests. Lanari Decl. Ex. 1, Zarn Dep. 45:21-47:13. A person could be contagious for 12-14 days and the mandatory testing of unvaccinated individuals would not discover the contagion. *Id.*

Bach testified that she did not think testing only unvaccinated persons was effective, partly because she had been vaccinated against COVID-19 but still contracted the virus. Lanari Decl. Ex. 2, Bach Dep. 45:6-46:24 (answered over counsel's objection for vagueness). Bach testified that it would have made sense to test everybody. Lanari Decl. Ex. 2, Bach Dep. 82:9-16. Bach testified that she did not believe it was fair that

MDHS's policy discriminated against religious or disabled employees. Lanari Decl. Ex. 2, Bach Dep. 82:23-85:13 (answered over counsel's objection based on foundation). Bach also testified that the way COVID-19 pay was handled was unfair. Lanari Decl. Ex. 2, Bach Dep. 85:15-86:2.

Cates testified that he knew MDHS's policy was not completely effective, and that vaccinated persons could still contract and transmit COVID-19. Lanari Decl. Ex. 3, Cates Dep. 14:7-15:18. Cates agreed that if safety were the goal, then everyone should be tested not only the unvaccinated. Lanari Decl. Ex. 3, Cates Dep. 16:17-21; *see also id.*, Cates Dep. 28:2-11 ("[…] it would have been a better policy to test everybody. But symptomatic people should always be tested, yes.") (answered over relevance objection). Cates also testified that it was unfair to allow COVID-19 Pay for vaccinated persons but not unvaccinated persons. Lanari Decl. Ex. 3, Cates Dep. 26:23-27:1. Cates also testified that the way the COVID-19 Pay was handled should have been collectively bargained for by MDHS and the union, and that MDHS implementing the policy unilaterally was stomping on Cates' union rights. Lanari Decl. Ex. 3, Cates Dep. 27:2-9. Cates and the union made their dissatisfaction with the way MDHS had handled its policy clear. Lanari Decl. Ex. 3, Cates Dep. 27:10-14.

MDHS's COVID-19 mandate gave its COVID-19 vaccinated employees a false sense of security that they could not contract and transmit COVID-19. CDC Director Rochelle P. Walensky, MD, MPH released a statement on July 30, 2021 that the Delta

variant resulted in similarly high viral loads, which suggested that COVID-19 vaccinated persons can transmit the virus.[1]

**G. MDHS could have reasonably accommodated Zarn without any hardship.**

Zarn's supervisor Bach testified that she did not know whether giving Zarn an exemption would cause any hardship at all. Lanari Decl. Ex. 2, Bach Dep. 58:23-59:8. Bach testified that she would not know any difference whether Zarn had been given an exemption or not. *Id.* Bach also testified that it would not have negatively affected her department if Zarn had been treated like other, vaccinated, employees. Lanari Decl. Ex. 2, Bach Dep. 60:13-16; Lanari Decl. Ex. 1, Zarn Dep. 65:1-4. Union president Cates testified that MDHS did not reach out to Cates about any possible accommodations for Zarn's religious beliefs. Lanari Decl. Ex. 3, Cates Dep. 26:5-8.

**H. MDHS did not disclose facts supporting Zarn's case because it purposely did not look for relevant information.**

Kuhlman testified she did not recognize Defendant's Answers to Interrogatories immediately, but did recognize her signature on the document. Lanari Decl. Ex. 5, Kuhlman Dep. 18:17-19:4 (referring to Lanari Decl. Ex. 16). Kuhlman also testified:

> Q: […] Do you recall ever being asked to review these interrogatory responses and document request responses?
>
> A: **Yes.**
>
> Q: […] first of all, were you working at St. Peter when you answered these discovery responses?

---

[1] Centers for Disease Control and Prevention, *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC ONLINE NEWSROOM, dated July 30, 2021, https://archive.cdc.gov/www_cdc_gov/media/releases/2021/s0730-mmwr-covid-19.html (last accessed August 28, 2024).

A: **Yes.**

Q: And you departed soon after?

A: **Yes.**

Q: What efforts did you make to discern which employees had interacted with Mr. Zarn with respect to his request for reasonable accommodation for his religious beliefs?

A: **I did not.**

Q: Okay. So is it fair to say that you didn't undertake any independent investigation?

A: **Not independently.**

Q: Okay. Did you undertake an investigation with counsel?

A: **No.**

Q: So is it fair to say that you didn't make any effort to determine which employees in the human resources department may have interacted with Mr. Zarn or Mr. Cates regarding his religious exemption request?

A: **Correct.**

Lanari Decl. Ex. 5, Kuhlman Dep. 19:5-20:7 (referring to Lanari Decl. Ex. 16). Kuhlman testified she had not reviewed the Complaint by the time of her deposition. Lanari Decl. Ex. 5, Kuhlman Dep. 20:19-21:21. Kuhlman also testified that she had not reviewed the Complaint prior to signing the Answers to Interrogatories. Lanari Decl. Ex. 5, Kuhlman Dep. 21:22-22:16. With respect to Interrogatory No. 4, Kuhlman testified that she had not reviewed any documents before she signed the Answers to Interrogatories. Lanari Decl. Ex. 5, Kuhlman Dep. 23:5-9. Kuhlman admitted that had not reviewed the Complaint prior to signing the Answers to Interrogatories, which included a response under oath identifying each fact as it related to, supported, or refuted any allegation. Lanari Decl. Ex. 5, Kuhlman Dep. 23:10-24:6. Kuhlman testified she did not even recalled seeing Defendant's Partial Answer to Plaintiff's Complaint, let alone review it before she had

signed the Answers to Interrogatories. Lanari Decl. Ex. 5, Kuhlman Dep. 24:17-25

(referring to Lanari Decl. Ex. 16). Kuhlman testified it would have been difficult to

answer questions in the Complaint or Answer if she had not reviewed either before

signing the Answers to Interrogatories. Lanari Decl. Ex. 5, Kuhlman Dep. 25:1-6

(referring to Lanari Decl. Ex. 16).

Kuhlman did not do any investigations before she answered under oath in

Defendant's Answers to Interrogatories. Kuhlman testified:

Q: With respect to Request No. 14.

A: **Yes.**

Q: All documents relating to budgetary concerns or budget decisions related to employment decisions for employees requesting religious exemptions from the COVID-19 vaccine mandate or COVID-19 testing mandate. Do you see that?

A: **Yes.**

Q: You never made any independent review of any documents looking for budgetary documents of any nature related to the answer to request No. 14; correct?

A: **Correct.**

[…]

Q: Request No. 18.

A: **Yes.**

Q: No investigation was done into the sincerity of Mr. Zarn's beliefs; correct?

A: **Not by me.**

Q: Was it done by anybody in your department?

A: **Not to my knowledge.**

Q: I'm going to direct your attention to page number 11 and Interrogatory No. 13.

[…]

Q: Did your answer identify anyone with responsibility for evaluating a religious exemption request to the COVID-19 vaccine policy?

A: **It did not.**

Q: Did you make any independent investigation to discern who, if anyone, in your department or related departments had that responsibility?

A: **I did not.**

Lanari Decl. Ex. 5, Kuhlman Dep. 25:25-27:19 (referring to Lanari Decl. Ex. 16). After Zarn filed the present lawsuit, MDHS changed its email policy to auto-delete emails older than 365 days, and prevented Zarn from accessing emails to find evidence and refresh his recollection. *See* Zarn Decl. ¶¶ 16-17.

## V.    ARGUMENT

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 711 (8th Cir. 2004); *see Labert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir. 1999); Fed. R. Civ. P. 56(c). The facts are viewed in the light most favorable to the non-moving party. *Midwest Oilseeds*, 387 F.3d at 711 (citing *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir.1996)). Reasonable inferences are also drawn in the light most favorable to the non-moving party. *Id.*

### A. MDHS's new affirmative defense of "failure to exhaust administrative remedies fails both because it is untimely and on its merits.

### i. MDHS's new affirmative defense that Zarn has failed to exhaust his administrative remedies is untimely and therefore MDHS Defendant has waived that affirmative defense.

"In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense[.]" Fed. R. Civ. P. 8(c). "The failure to plead an affirmative defense results in its forfeiture and exclusion from the case." *Crutcher v. MultiPlan, Inc.*,

22 F.4th 756, 765 (8th Cir. 2022) (citing *Wood v. Milyard*, 566 U.S. 463, 470 (2012)).

"Failure to exhaust administrative remedies is an affirmative defense that a defendant

must prove." *Kirklin v. Joshen Paper & Packaging of Arkansas Co.*, 911 F.3d 530, 534

(8th Cir. 2018) (citing *Miles v. Bellfontaine Habilitation Ctr.*, 481 F.3d 1106, 1107 (8th

Cir. 2007) (per curiam)).

"'[T]he Rule 8(c) pleading requirement is intended to give the opposing party both

notice of the affirmative defense and an opportunity to rebut it,' but we decline to adhere

to a construction of the Rule that would privilege 'form over substance.'" *First Union

Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 622 (8th Cir. 2007). As long as

"an affirmative defense is raised in the trial court in a manner that does not result in

unfair surprise, technical failure to comply with Rule 8(c) is not fatal." *Id.* (alterations

and internal quotation marks omitted). This includes the "bare assertion" of a defense

without being "articulated with any rigorous degree of specificity." *Zotos v. Lindbergh

Sch. Dist.*, 121 F.3d 356, 361 (8th Cir. 1997) (emphasis and internal quotation marks

omitted).

MDHS did not raise "failure to exhaust administrative remedies" in its Partial

Answer to Plaintiff's Complaint on August 15, 2022. *See* Dkt. 16. Likewise, MDHS did

not raise this defense in its Memorandum of Law in support of its Motion to Dismiss on

August 15, 2022. *See* Dkt. 14. MDHS did not raise even a "bare assertion." *See Zotos*,

121 F.3d at 361. Therefore, MDHS waived the affirmative defense of "failure to exhaust

administrative remedies."

In fact, the first time MDHS raised "failure to exhaust administrative remedies" as an affirmative defense was in its present motion for summary judgment. Unsurprisingly, there is little in the record for Zarn to defend against this new argument: it was not raised until now. Just as Zarn cannot now bring a summary judgment motion against MDHS based on breach of contract, or any other action not in his Complaint, MDHS cannot bring a motion for summary judgment based on "failure to exhaust administrative remedies" because MDHS did not plead it in its Answer. MDHS has the burden of proof for "failure to exhaust administrative remedies," and MDHS cannot raise that defense for the first time on summary judgment. No discovery has been answered, nor have any depositions been taken, relative to "failure to exhaust administrative remedies." Any failure to plead an affirmative defense waives that defense, and it may not be raised later for the first time at summary judgment.

MDHS cites cases that undermine its claim that it can raise "failure to exhaust administrative remedies" for the first time at summary judgment. In contrast to the present case, in *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, First Union informed Pictet of its intent to use a certain affirmative defense twice: first in response to Pictet's motion for reconsideration, and second in a brief filed in a previous appeal. 477 F.3d at 623. Furthermore, First Union referred to details of its affirmative defense in both instances, and described how the defenses applied to the case. *Id.* The Eighth Circuit held that there was no unfair surprise to Pictet because the facts relevant to the affirmative defense were in the record and undisputed. *Id.* Critically, Pictet had the opportunity to respond to the defense multiple times, so there was no prejudice. *Id.*

18

Here, MDHS did nothing that put Zarn on notice of its new defense that Zarn failed to exhaust administrative remedies. MDHS's failure to raise "failure to exhaust administrative remedies" as an affirmative defense has unfairly prejudiced Zarn. MDHS raised "failure to exhaust administrative remedies" as an affirmative defense for the first time only 21 days ago, over 750 days since Zarn filed his Complaint. *See* Dkt. 1 (Complaint filed July 11, 2022). MDHS also did not raise this defense in its Partial Answer or in its Motion to Dismiss, which was filed over 720 days ago. *See* Dkt. 16 (Partial Answer to Plaintiff's Complaint filed August 15, 2022); Dkt. 14 (Motion to Dismiss filed August 15, 2022). MDHS only raised "failure to exhaust administrative remedies" as an affirmative 21 days ago, and MDHS has unfairly surprised and prejudiced Zarn.

Even if Zarn's charge of religious discrimination was somehow insufficient – which it was not – MDHS could have asserted "failure to exhaust administrative remedies" as a defense during any of the 758 days of litigation prior to the present dispositive motion. *See* Dkt. 1 (Complaint filed July 11, 2022); Dkt. 30 (Order filed November 30, 2023 that fact discovery shall be completed by 1/5/2024). Instead, MDHS has asserted "failure to exhaust administrative remedies" for the first time 215 days after the discovery deadline. Dkt. 36 (Defendant's Motion for Summary Judgement filed August 7, 2024). Therefore, Zarn is unfairly prejudiced by MDHS's sudden assertion of "failure to exhaust administrative remedies" as an affirmative defense.

### ii.    On the merits, MDHS's new affirmative defense fails because Zarn exhausted his administrative remedies as to his Title VII claims.

In the alternative, if the Court decides to rule on MDHS's affirmative defense on the merits, Zarn did not fail to exhaust administrative remedies and MDHS's defense fails. MDHS accurately reproduces the relevant portion of Zarn's EEOC complaint. In his March 25, 2022 EEOC complaint for religious discrimination, Zarn states:

> I sincerely hold a religious belief that conflicts with my employers vaccination and testing requirement. During my employment, I notified my employer of my religious belief and requested a religious accommodation to [Defendant's] Covid-19 vaccination and testing mandate, which was denied. I believe I have been discriminated against because of my religion, Catholic […].

Def.'s Mem. 7, Lanari Decl. Ex. 17. Similarly, Zarn states in his May 9, 2022 EEOC complaint for disability discrimination:

> I was notified by my employer that it would be requiring all employees to be fully vaccinated for Covid-19 or be subjected to weekly Covid-19 testing from that week forward. During my employment, I requested an accommodation to Respondents Covid-19 vaccination and testing mandate, which was denied. The required Covid-19 test was just for the unvaccinated employees. This is discriminatory since both the unvaccinated and vaccinated groups can catch and transmit Covid-19. The ADA provides that its general prohibition against discrimination shall include medical examinations and inquiries by an employer. […] I believe I have been discriminated against based on disability […].

Lanari Decl. Ex. 18.

MDHS claims that Zarn's two EEOC complaints did not put MDHS on notice of what Zarn now argues in federal court. However, there is no serious dispute that Zarn's EEOC complaints adequately identified the parties, and the general action or practice challenged.

The Eighth Circuit rule is that the charge must be sufficiently precise to identify the parties, and describe generally the action or practices challenged. *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006). Courts will claims that are "like or reasonably related to the administrative charges that were timely brought." *Wedow v. City of Kansas City*, 442 F.3d 661, 672 (8th Cir. 2006) (internal citations and quotation marks omitted). Zarn is not limited to the specific facts stated in his EEOC complaints, rather "claims of employment discrimination […] *may be as broad* as the scope of the EEOC investigation which reasonably could be expected to result from the administrative charge." *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005) (emphasis added) (internal citations omitted).

MDHS claims that Zarn did not complain of *every* instance of discrimination in his complaint, but he need not do so. Zarn must only complain *generally* of MDHS's actions or practices. Zarn complained in his EEOC complaint that MDHS's vaccination and testing requirement violated his religious beliefs. MDHS does not argue that MDHS was not put on notice of which policies were at issue, and there is no dispute that MDHS knew which of its policies violated Zarn's religious beliefs. Zarn's EEOC complaints both adequately identified the parties (Zarn and MDHS), and the general actions or practices (MDHS's COVID-19 mandate).

MDHS argues that it was not put on notice by Zarn's EEOC complaint that its discriminatory use of COVID-19 Pay was an issue. MDHS chose to link some of its policies to its COVID-19 mandate. One such MDHS policy was the ability to receive COVID-19 Pay: MDHS only allowed employees who chose/were able to choose to

receive the COVID-19 vaccination to be eligible to receive COVID-19 Pay. MDHS

argues that it was not put on notice that its own policies were linked to its employees'

forced choice between two options (COVID-19 vaccination or COVID-19 testing), but

that argument is disingenuous at best. Zarn's March 25, 2022 EEOC complaint indicates

both the policy in question and the discriminatory effect. MDHS's two policies are not

unrelated: they rely on each other. If MDHS had decided to terminate everyone who

could not be vaccinated, that would be an effect of its COVID-19 mandate and Zarn's

EEOC complaint puts MDHS on notice of that effect. MDHS could not claim it had no

notice that its COVID-19 mandate led to termination of its employees. Likewise, MDHS

cannot that it was not put on notice that its COVID-19 mandate discriminated against its

employees, specifically Zarn, when it came to distributing COVID-19 Pay. MDHS did

not allow COVID-19 Pay to be given to individuals who could not receive the COVID-19

vaccine because of their religious convictions.

Therefore, even if this Court were to consider MDHS's "failure to exhaust

administrative remedies" argument on the merits, Zarn's EEOC religious discrimination

complaint satisfies the requirements under the law because Zarn's EEOC complaint gave

MDHS sufficient notice of what Zarn argues now in federal court.

Similarly, Zarn's EEOC disability discrimination complaint satisfies the

requirements of identifying the parties and describing generally the action or practice

challenged. In his EEOC complaint, Zarn complained that MDHS was forcing testing

only on persons who were unvaccinated, whether the employee chose to be unvaccinated

for religious, medical, or any other reasons. In the present lawsuit, Zarn has complained

of the same discriminatory and otherwise unlawful testing and MDHS does not contest the adequacy of this complaint. In any case, Zarn has met the threshold of specifying the parties and the MDHS's unlawful testing. Therefore, Zarn's EEOC disability discrimination complaint also satisfies the requirements under the law.

**B. MDHS's motion for summary judgment fails because MDHS discriminated against Zarn based on his religious beliefs and MDHS failed to accommodate Zarn's religious beliefs.**

Title VII of the Civil Rights Act of 1964 forbids an employer to:

(1) to […] otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's […] religion, […]; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's […] religion […].

42 U.S.C. § 2000e–2(a). "Religion" includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

To survive a motion for summary judgment with a Title VII claim, a plaintiff must show either direct evidence of a Title VII violation or create an inference of discrimination or retaliation under the *McDonnell Douglas* burden-shifting framework. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015).

To establish a prima facie case of direct religious discrimination under Title VII, a plaintiff must show (1) they have a bona fide religious belief that conflicts with an employment requirement; (2) they informed their employer of the belief; and (3) they were disciplined for failing to comply with the conflicting requirement of employment. *Jones v. TEK Indus., Inc.*, 319 F.3d 355, 358-59 (8th Cir. 2003) (quotation marks and internal citations omitted).

"In the absence of direct evidence, the *McDonnell Douglas* framework applies, which requires a plaintiff to make a prima facie case of discrimination or retaliation." *Id.* (internal citations omitted). "If a plaintiff satisfies this burden, the defendant then has the burden of showing a legitimate, non-discriminatory reason for the challenged action." *Id.* (internal citations omitted). "If the defendant offers such a reason, the burden shifts back to the plaintiff to show the defendant's proffered reason is a pretext." *Id.* (internal citations omitted).

To establish a prima facie case of indirect religious discrimination [under the *McDonnel Douglas* framework], a plaintiff must show: (1) she is a member of a protected class because of her religious beliefs, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (internal citation omitted). Circumstances giving rise to an inference of discrimination include treating similarly situated employees who are not members of the protected class in a different manner. *Id.*

There are some overlapping elements between *Shirrell* and *Jones* for each of Zarn's claims, but MDHS disputes only two elements (1) that Zarn notified MDHS of his religious beliefs, *see* Def.'s Mem. 11-13, and (2) that Zarn was not subject to adverse action by MDHS because of his religious beliefs. *See* Def.'s Mem. 11, 13-15. MDHS does not dispute: the sincerity of Zarn's religious beliefs, that Zarn is member of a protected class, that Zarn met MDHS's legitimate expectations, nor that Zarn has a bona fide religious belief that conflicts with MDHS's requirements. MDHS has thus admitted Zarn satisfies the other elements.[2] *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("the party opposing the motion for summary judgment bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact." (internal citations omitted) (emphasis in original)). Although MDHS has not disputed that the circumstances give rise to an inference of discrimination by MDHS against Zarn, this element will be discussed below, along with each of the two disputed elements by MDHS

### i. Zarn notified MDHS of the conflict with its COVID-19 multiple times, but was ignored.

MDHS argues that Zarn did not inform it of his religious beliefs, but this misstates the factual record. Zarn testified that he informed MDHS of the discrimination its COVID-19 mandate was causing *on at least three separate occasions*, and specifically identified the conflict between MDHS's COVID-19 mandate and Zarn's religious beliefs.

---

[2] MDHS has stated that it reserves the right to contest that [Zarn] has a bona-fide religious belief, presumably reserving the right to contest at trial. *See* Def.'s Mem. 11 n.1.

Furthermore, Cates testified that he also informed MDHS of Zarn's religious beliefs.

Every deponent of MDHS testified that they found Cates trustworthy. Additionally,

MDHS's policy shows that many of the MDHS representatives whom Zarn informed of

his religious beliefs and who had an *obligation* to escalate Zarn's concerns to their

supervisors. Zarn's protected status was clear to Bach when he relayed his concerns, and

so MDHS was sufficiently aware of Zarn's religious conflict. Employees who failed to

escalate Zarn's concerns would be a violation of MDHS's policies and Title VII. In fact,

Cates testified that he did not know what else Zarn could have done to give MDHS more

notice of his religious conflict, given that MDHS refused to accommodate Zarn and told

Cates that MDHS would give no religious exemptions to its COVID-19 mandate. Lanari

Decl. Ex. 3, Cates Dep. 25:13-18. This is more than enough evidence *to win at trial*, let

alone to survive a motion for summary judgment. MDHS's arguments are based on a

factual inaccuracy.

To the extent that MDHS claims that Zarn does not know the *exact* persons spoken

to: it is only because it made *no* efforts to ascertain these individuals:

Q: No investigation was done into the sincerity of Mr. Zarn's beliefs; correct?

A: **Not by me.**

Q: Was it done by anybody in your department?

A: **Not to my knowledge.**

   […]

Q: Did your answer identify anyone with responsibility for evaluating a religious exemption request to the COVID-19 vaccine policy?

A: **It did not.**

Q: Did you make any independent investigation to discern who, if anyone, in your department or related departments had that responsibility?

A: **I did not.**

Lanari Decl. Ex. 5, Kuhlman Dep. 26:18-23, 27:11-19. The lack of information will be discussed further in Section E. below. A jury can conclude that Zarn notified MDHS multiple times, and that MDHS completely ignored him. In fact, MDHS *continues* to ignore and minimize Zarn's religious beliefs, and proves such in its present motion. MDHS tries to take advantage of its bad faith and argues: "[t]he undisputed facts show that [Zarn] failed to inform [MDHS] of a conflict with his religious belief and the [COVID-19 mandate], and failed to request an accommodation to the policy." Def.'s Mem. 13.

### ii.    Zarn was subject to adverse action by MDHS because of his religious beliefs.

MDHS argues that "[h]aving to take a test and submit verification of the same is not adverse employment action," Def.'s Mem. 14, but that is not the law.

In *Muldrow v. St. Louis*, the plaintiff had been transferred by her employer against her wishes to a different job, but her rank and pay remained the same. *Muldrow v. St. Louis*, 601 U.S. 346, 351 (2024). The Supreme Court held that the plaintiff only needs to show *some* harm or injury respecting an identifiable term or condition of employment. *Id.* at 354-55, 359 (emphasis added). The Supreme Court held that the employment action need not have left the plaintiff significantly worse off. *Id.* at 359.

Similarly, in *Cole v. Group Health Plan, Inc.*, the plaintiff's employer had forbidden her to wear an orange badge lock because she did not receive the COVID-19

vaccination. *Cole v. Group Health Plan, Inc.*, 105 F.4th 1110, 1112 (8th Cir. 2024). The Eighth Circuit held that the lack of a badge lock was a sufficient allegation under Title VII, which requires only "some harm respecting an identifiable term or condition of employment." *Id.* (citing *Muldrow*, 601 U.S. at 353-55)The Eighth Circuit also reasoned that "the denial of a requested religious accommodation absent a showing of undue hardship may itself constitute an adverse action. *Id.*

MDHS's policy was a mandate: get a COVID-19 vaccine or submit to regular testing, there was no third option. MDHS argues that it gave Zarn an accommodation by forcing Zarn to submit to COVID-19 testing as a result of MDHS's COVID-19 mandate. Def.'s Mem. 15-16. Zarn suffered adverse employment action because MDHS forced Zarn to submit to COVID-19 testing as a condition of employment, and MDHS refused to accommodate Zarn's religious beliefs. MDHS breached their obligations under Title VII to reasonably accommodate Zarn's religious beliefs.

### iii.    The circumstances give rise to an inference of discrimination by MDHS against Zarn.

MDHS's COVID-19 mandate supports an inference of direct religious discrimination. MDHS's COVID-19 mandate forces employees to choose one of two options (COVID-19 vaccination or COVID-19 testing), and does not allow any employee to request a religious exemption. Furthermore, MDHS sent numerous emails to its employees explicitly stating that employees who could not receive the COVID-19 vaccination were more dangerous than unvaccinated employees. A jury can infer that

MDHS is targeting individuals who were unable to take the COVID-19 vaccine because of their religious beliefs.

C. **MDHS failed to accommodate Zarn's sincerely held religious beliefs and has no facts to support its argument that accommodating Zarn would be an undue burden because it did no analysis.**

Under *Groff v. DeJoy*, the Supreme Court *clarified* (it did not overturn) the Title VII substantial hardship standard, noting the substantial hardship "fact-specific inquiry comports with both *Trans World Airlines* and the meaning of 'undue hardship' in ordinary speech." *Groff v. DeJoy*, 600 U.S. 447, 468, 473 (2023). The Supreme Court, throughout its 9-0 opinion, maintained it did not create a new substantial hardship standard but emphasized its standard had always been the Title VII standard for religious discrimination cases. *See, generally id.* However, the Supreme Court did explicitly denounce some lower courts' misinterpretation of "undue hardship" as meaning merely a cost more than *de minimis*. *Id.* at 454 (internal citations and quotation marks omitted); *see, generally, id. Groff* was the last in the line of Supreme Court jurisprudence that strongly criticized the lower courts' creation of a *de minimis* standard separate from the language of Title VII.

Accommodating an employee's religious beliefs is an affirmative duty. *Groff* summarized the courts' rulings on Title VII, where the courts rejected that the language of Title VII established that employer's had any duty to change their practices to accommodate their employees. *Groff*, 600 U.S. at 458. As the Court explained, Congress amended Title VII to explicitly require a duty for employers to accommodate their employees' religious beliefs. *Id.* As mentioned, Congress used the term "reasonable

accommodation," which it and the EEOC have always meant as a requirement for employers to accommodate their employees' religious beliefs unless it resulted in a substantial hardship for that employer. *See id.*

Furthermore, EEOC guidelines are unambiguous in interpreting Title VII to protect an employee for *any* religious belief, even if that employee is the *only one* to have that religious belief. The EEOC was created by Congress to enforce, implement, and issue guidance for employers to comply with Title VII. *See generally* 42 U.S.C. §§ 2000e-4–e-6, e-8–e-10, e-12–e-16. EEOC guidelines clearly require an employer to accommodate an employee's religious belief that conflicts with *any* of its policies. The only exception is if granting an accommodation would result in "*substantial* increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470 (citing *Hardison*, 432 U.S. at 83, n. 14).

> EEOC Compliance Manual § 12 states:
>
> The Commission's position is that the denial of reasonable religious accommodation absent undue hardship is actionable [...] This is because requiring him to work without religious accommodation where a work rule conflicts with his religious beliefs necessarily alters the terms and conditions of his employment for the worse.

EEOC Compliance Manual § 12 (internal citations omitted); *see also Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 350, 359 (2024) (holding that an employee need only show injury because Title VII does not require any heightened showing of harm).

The Supreme Court relies on EEOC's regulations and guidance as persuasive authority, if not binding authority, when interpreting Title VII. In *Groff*, the Court noted

Congress "[t]rack[ed] EEOC's regulatory language" and added into Title VII: "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without the undue hardship on the conduct of the employer's business." *Groff*, 600 U.S. at 458, 466-67. The Court also deferred to the EEOC that lower courts' interpretation of *de minimis* was inaccurate, and noted EEOC guidance had continued to demand a religious belief or practice must be particularly burdensome before an employer may ignore it. *Id.*

The undue hardship inquiry is fact-intensive, and "courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Groff*, 600 U.S. at 470-71 (internal citation and quotation marks omitted); *see also Harrell v. Donahue*, 638 F.3d 975, 979 (8th Cir. 2011) ("Determinations of what constitutes an 'undue hardship' must be made on a case-by-case basis") (internal citation omitted).

EEOC Compliance Manual § 12  also states that *once an employer is on notice* of an employee's religious observance or practice that is in conflict with a work policy "it would violate Title VII for an employer to fail to provide a reasonable accommodation unless it *proves* that doing so would pose an undue hardship." EEOC Compliance Manual § 12. Furthermore, an employer "should not assume that a request is invalid simply because it is based on religious beliefs or practices with which the employer is unfamiliar, but should ask the applicant or employee to explain the religious nature of the

practice and the way in which it conflicts with a work requirement." *Id.* In cases where "an employer has made no effort to act on an accommodation request, courts have found that the employer lacked the evidence needed to meet its burden of proof to establish that the plaintiff's proposed accommodation would actually have posed an undue hardship." *Id.*; *see, e.g., EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991); *EEOC v. Ithaca Indus., Inc.*, 849 F.2d 116, 118-19 (4th Cir. 1988).

MDHS is liable to Zarn under Title VII because it did not accommodate his sincerely held religious beliefs. MDHS claims accommodating Zarn would have resulted in an undue burden, but the facts taken in the best light to Zarn, and the undisputed facts, show that MDHS never did any analysis. This is fatal to MDHS's argument that accommodating Zarn would have posed an undue burden to them (a substantial hardship in the course of their entire business).

Zarn reached out to MDHS at least three times regarding the conflict between MDHS's COVID-19 mandate and Zarn's religious beliefs. Cates also reached out to MDHS about possible accommodations for Zarn regarding his religious conflict with MDHS's COVID-19 mandate. MDHS flatly refused to provide any accommodation to Zarn, and ignored his religious beliefs. Despite Zarn doing *everything he could have done*, MDHS refused to work with Zarn in any way. *See* Lanari Decl. Ex. 3, Cates Dep. 25:13-18. At no time did MDHS attempt to accommodate Zarn's beliefs. Zarn was proactive, he communicated to MDHS the conflict with MDHS's COVID-19 mandate and Zarn's religious beliefs through multiple avenues, including through his union president Cates. Nevertheless, MDHS refused to attempt to accommodate Zarn in any

way. Had MDHS did *any* investigation, it would have found that it cost *nothing* to accommodate Zarn. *See* Bach Dep. 58:23-59:8, 60:13-16. Even in its present motion for summary judgment, MDHS makes conclusory arguments that accommodating Zarn would have been an undue burden, *without any testimony or documents to support it*. MDHS has no documents supporting its claim because no documents exist, despite Zarn seeking these documents in his document requests. *See* Lanari Decl. Ex. 15, Interrogatory No. 8 ("Identify each fact that relates to, supports, or refutes any […] affirmative defense."); *id.*, Document Request No. 3 ("All documents, records or correspondence referenced in relation to the response to any Interrogatory or identified in the response."). The evidence in the record is that Zarn's supervisor Bach testified that there would have been no cost to accommodate, and *she would not have even noticed* if Zarn had received a religious accommodation. Lanari Decl. Ex. 2, Bach Dep. 58:23-59:8. These facts support the inference that MDHS discriminated against Zarn by flatly refusing to acknowledge, investigate, or accommodate Zarn's religious beliefs.

MDHS enforced its COVID-19 mandate, which required its employees to either receive COVID-19 vaccinations or submit to regular testing. MDHS did not allow any religious exemptions to its testing requirement. There is nothing in the record to show that the testing was effective, and plenty of evidence to show that it was ineffective. Furthermore, there has not been any discovery or documents which show that MDHS's policy was effective in any measure, nor that exempting Zarn from the testing requirement would have caused *any* burden, let alone an undue burden. The only "evidence" that MDHS presents to claim that accommodating Zarn would have been an

undue burden is arguments from its lawyers in its Memorandum. Excepting MDHS's present argument, the factual record is undisputed: it was not an undue burden to accommodate Zarn's religious beliefs and exempt him from the testing requirement. Zarn's supervisor Bach testified at two separate times during her deposition that it would not have mattered to her unit whether Zarn was testing or not. It also would not have mattered whether Zarn was exempt from MDHS's COVID-19 policy altogether. *There is no evidence in the record* after discovery that shows MDHS would have incurred *any* hardship or increased cost by accommodating Zarn's religious beliefs.

The cases MDHS cites are neither binding nor relevant. MDHS cites cases from the Third Circuit, Fourth Circuit, Sixth Circuit, and various district courts. The only thing these cases have in common is that they concern persons and employers' COVID-19 policies. MDHS argues these cases stand as conclusive authority that this Court must rule *as a matter of law* that Zarn cannot have protected religious beliefs if they conflict with MDHS's COVID-19 policy. MDHS argues this Court must ignore Zarn's religious beliefs, and follow what MDHS says is law: "[a]llowing an employee who was not vaccinated and not testing in the workplace constitutes an undue hardship." Def.'s Mem. 18. This is not the law. Despite citing many cases which are on appeal or overturned, MDHS makes an argument with no legal relevance. MDHS argues that *factual* similarities regarding COVID-19 or policies between Zarn's circumstances decide Zarn's case at the summary judgment stage. But the law this Court is bound to follow comes either from the Eighth Circuit or the U.S. Supreme Court, which are cited above, and both courts mandate denying MDHS's motion for summary judgment.

**D. There is a genuine dispute as to the material facts surrounding Zarn's Americans with Disabilities Act claims.**

The ADA "generally prohibits employers from requiring current employees to undergo medical examinations or inquiries unless the employer can demonstrate they are 'job-related and consistent with business necessity.'" *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 406 (8th Cir. 2018) (citing 42 U.S.C. § 12112(d)(4)). Furthermore, "[i]f a violation occurs, **it is not necessary that an applicant be disabled** to bring a claim under § 12112(d)." *Hustvet*, 910 F.3d at 406 (emphasis added); *see Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). "The applicant must, however, establish the [ ] employer's violation of the ADA caused some sort of tangible injury. *Hustvet*, 910 F.3d at 406 (citing *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999)). "The employer must establish the exam or inquiry is job-related, the business necessity for the exam or inquiry is vital to the business, and the exam or inquiry is no broader or more intrusive than necessary." *Hustvet*, 910 F.3d at 408 (internal citation omitted).

In *Hustvet v. Allina Health Sys.*, the Eighth Circuit held there was no violation of the ADA because there was record evidence of the usefulness of the defendant's testing requirements. *Id.* at 409. Furthermore, the Eighth Circuit held that there was sufficient evidence in the record that the testing was consistent with the job-related requirements, and it was a reasonably effective way to achieve those goals. *Id.* at 408-09. Here, on the contrary, there is absolutely no evidence that MDHS's COVID-19 mandate was necessary or even minimally effective. MDHS has produced *nothing* during discovery that shows that testing was in any way effective, let alone testing only of unvaccinated

individuals, despite concluding discovery. Zarn was harmed because he was forced to test because of his religious beliefs. MDHS targeted Zarn solely because his religious beliefs precluded him from receiving a COVID-19 vaccine. Furthermore, Bach testified that it would not have mattered whether Zarn tested or not, so MDHS's forcible testing of Zarn had absolutely no basis. Zarn sought accommodation at least three times, but MDHS refused to respond or to engage in any interactive process. Zarn was singled out and forced to test because of his religious beliefs. MDHS cannot defend its claim that its COVID-19 mandate was necessary or effective, because MDHS did not base its policy on any scientific evidence. In the light viewed most favorably to Zarn, MDHS forced him to submit to mandatory testing that was not a job-related necessity, in violation of the ADA.

Furthermore, EEOC guidance states that such tests that MDHS were conducting fall under the ADA: "A COVID-19 viral test is a medical examination within the meaning of the ADA." *See* Def.'s Mem. 20 (citing U.S. Equal Emp. Opportunity Comm'n, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act and Other EEO Laws*, EEOC (https://perma.cc/R67U-5ZMX). This is a reference to the ADA's prohibition on an employer's requirement of a medical examination "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). As explained above, MDHS has absolutely no evidence of the necessity or helpfulness of its COVID-19 mandate, so it cannot defend itself that the mandatory testing of unvaccinated persons is job-related or consistent with business necessity. Again, MDHS makes an argument without legal relevance: it cites cases where the facts seem similar to the present case, including an employer's COVID-19 policy and

an employee's lawsuit regarding the ADA and a testing component of the employer's policy. *See* Def.'s Mem. 22-23. However, MDHS's argument that *as a matter of law* **any** kind of required testing MDHS chooses to impose on its employees, if it concerns COVID-19, is misplaced. The cases MDHS cited had facts which suggested that those testing requirements were necessary, but MDHS has no such facts in this case after discovery.

At the summary judgment stage, all inferences must go in favor of the non-moving party and this Court must accept that Zarn has sincerely held religious beliefs, that those beliefs conflicted with MDHS's COVID-19 mandate, that Zarn informed MDHS of that conflict on multiple occasions, and that MDHS forced him to follow its COVID-19 mandate, and refused any religious accommodation. Discovery is concluded, and there is no evidence in the record that MDHS sought to accommodate Zarn's religious objections to its mandated testing, but instead forced him to follow the policy even though it meant going against his religion. Since this Court must construe the facts in the light most favorable to Zarn at this stage, this means Zarn did absolutely everything he could think to do, indeed everything that had been asked of him, and MDHS ignored him and refused to accommodate his religious beliefs.

### E.  MDHS responded to Zarn's discovery in bad faith, and tries to take advantage of its own failure to investigate and answer Zarn's discovery requests as required by law.

Furthermore, MDHS admitted that it had conducted *no* investigation into Zarn's religious beliefs or done any investigation during discovery which would have revealed to whom Zarn and Cates spoke to within MDHS and what was said. MDHS had an

obligation to respond in good faith to Zarn's interrogatories and requests for production of documents. Yet, MDHS responded in bad faith and has continued to ignore Zarn's religious beliefs. MDHS has attempted to take advantage of its bad faith responses to Zarn's interrogatories and requests for production of documents in its present motion for summary judgment.

Kuhlman, who answered Zarn's interrogatories and requests for production of documents, admitted *she did no investigation* before she answered Zarn's interrogatories and requests for production of documents. Furthermore, Kuhlman admitted she lied when she responded to Zarn's interrogatories *because she had never read the pleadings* but responded to Zarn's questions as to what was responsive to those pleadings. MDHS relies on its own failure to search for *any* responsive documents or *any* investigation into the truth of its own answers as a factual basis to dispute Zarn's case. Additionally, MDHS *knows* its representative did no investigation *because Kuhlman testified she did no investigation at her deposition*, **but MDHS brought its present motion relying on, and despite, its own failure to answer Zarn's interrogatories and requests for production of documents in good faith.** MDHS is arguing this motion based on lack of information produced during discovery due to its own negligence. That is, MDHS is proceeding on bad faith. MDHS argues "there is no record of [Zarn] ever informing [MDHS] he had a religious belief conflicting with the [COVID-19 mandate], and no record of [Zarn] requesting an accommodation." Def.'s Mem. 11. This Court should not allow MDHS to benefit from the lack of information stemming from its own failure to respond in good faith during discovery.

Courts have consistently applied the doctrine of *commodum ex injuria sua nemo habere debet*, that no one should profit from their own wrongdoing.[3] *See, e.g., Northwell Health Inc. v. Lamis*, No. 18CV1178, 2019 WL 4688704, *3 (S.D.N.Y. Sept. 25, 2019) ("[commodum ex injuria sua nemo habere debet] is an iteration of the "unclean hands" doctrine, under which "[a] court may decline to exercise its equitable powers in favor of a party whose 'unconscionable act ... has immediate and necessary relation to the matter that he seeks in respect of the matter in litigation.'") (citing *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 969 (S.D.N.Y. 1992) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)); *see also PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004) ("[T]he equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage." (quotation marks omitted))). "Application of the ... doctrine rests with the discretion of the court, which is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Health Inc. v. Lamis*, No. 18CV1178, 2019 WL 4688704, at *3 (citing *Aris-Isotoner Gloves, Inc.*, 792 F. Supp. at 969-70 (quotation marks omitted)). The Oklahoma Supreme

---

[3] Aaron X. Fellmeth and Maurice Horwitz, GUIDE TO LATIN IN INTERNATIONAL LAW (1 ed.), *Commodum ex iniuria sua nemo habere debet*, https://www.oxfordreference.com/display/10.1093/acref/9780195369380.001.0001/acref-9780195369380-e-379 (last accessed August 26, 2024).

Court succinctly describes how this maxim permeates throughout common law. *Ohio Cas. Ins. Co. v. Todd*, 813 P.2d 508, 513 n.19 (Okla. 1991) (Opla, J., concurrence).[4]

Consequently, the Federal Rules of Civil Procedure include numerous safeguards against parties that seek to benefit from their own wrongdoing. Rule 37(b)(2)(A) provides the following:

> If a party […] fails to obey an order to provide or permit discovery […] the court where the action is pending may issue further just orders. They may include the following:
>
> (i)     directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

---

[4] One could find many instances in support of the common law's commitment to the free-will precept, not the least of which is the principle which generally bars one from profiting from his own wrong. *Amicable Society v. Bolland*, 5 Eng.Rep. 70 [N.S. 1815]; *Cleaver v. Mutual Fund Life Association*, 1 Q.B. 147 [C.A. 1892]; *see also State Mut. Life Assur. Co. of Amer. v. Hampton*, 696 P.2d 1027, 1034, 1035, n. 6 [Okla. 1985] (Opala, J., concurring). The rule is believed to have its antecedents in ancient maxims of general English jurisprudence: No man shall take advantage of his own wrong and its Law–French and Latin counterparts—(1) *Nul prendra advantage de son tort demesne* (no one shall take advantage of his own wrong); (2) *Nullus commodum capere potest de injuria sua propria* (no one can obtain an advantage by his own wrong), *De Zotell v. Mutual Life Ins. Co. of New York*, 245 N.W. 58, 59 [S.D. 1932]; (3) *Jus ex injuria non oritur* (a right does not rise out of a wrong); (4) *Nemo allegans suam turpitudinem est audiendus* (no one alleging his own turpitude is to be heard as a witness; this maxim applies to a party seeking to enforce a right founded on an illegal consideration), *Davis v. Brown*, 94 U.S. 423, 426 [1877]; (5) *Nemo ex proprio dolo consequitur actionem* (no one by his own fraud or wrong acquires a right of action), *De Vall v. Strunk*, 96 S.W.2d 245, 247 [Tex.Civ.App.1936]; (6) *Ex dolo malo non oritur actio* (a right of action cannot arise out of fraud), *Martineau v. Gresser*, 182 N.E.2d 48, 57 [Ohio Com.Pl 1962] ); and (7) *In pari delicto potior est conditio defendentis* (in the case of equal fault, the defendant's position is stronger), *Kelly v. Courter*, 30 P. 372, 373 [Okla. 1892] (other citations omitted).

    (iii)    striking pleadings in whole or in part;

    (iv)    staying further proceedings until the order is obeyed;

    (v)    dismissing the action or proceeding in whole or in part;

    (vi)    rendering a default judgment against the disobedient party; or

    (vii)    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Likewise, Rule 37(c) includes the following powers for this Court:

(1) *Failure to Disclose or Supplement*.

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

(2) *Failure to Admit*.

If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court must so order unless:

(A) the request was held objectionable under Rule 36(a);

(B) the admission sought was of no substantial importance;

(C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or

(D) there was other good reason for the failure to admit.

Additionally, this Court has inherent powers to sanction and enforce good faith and decorum:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."
>
> Prior cases have outlined the scope of the inherent power of the federal courts. For example, the Court has held that a federal court has the power to control admission to its bar and to discipline attorneys who appear before it. While this power "ought to be exercised with great caution," it is nevertheless "incidental to all Courts."
>
> In addition, it is firmly established that "[t]he power to punish for contempts is inherent in all courts." This power reaches both conduct before the court and that beyond the court's confines, for "[t]he underlying concern that gave rise to the contempt power was not ... merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial."

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991) (internal citations omitted)

MDHS knew that it had not properly responded to Zarn's interrogatories and requests for production of documents after the deposition of Kuhlman on January 5, 2024 *at the latest*. However, MDHS has *still* not updated its discovery responses and document production to Zarn. Furthermore, there has been no efforts by MDHS to supplement the discovery *it has actual knowledge is deficient*. Instead, MDHS has brought the present motion for summary judgment *relying on its deficient discovery responses* to use as a "fact" that Zarn must respond to. MDHS's motion for summary judgment is made in bad

faith and with actual knowledge that it is attempting to benefit from its deficient discovery responses. MDHS also prevented Zarn from gathering information because it instituted new email policies which deleted old Outlook entries including emails.

It is proper for this Court to use its powers to prevent MDHS from benefitting from bad faith tactics due to its negligence. Zarn has evidence from every deponent that MDHS was contacted about, and knew of, Zarn's religious objections to its policy. MDHS relies on the fact that the *specific person* is not known, but the only reason that person is not known is because MDHS failed to do *any* investigation as to who actually communicated with Zarn, and has refused to provide the name and contact information for that/those individual(s) so that Zarn may have access to that/those person(s). The Court should not allow MDHS to benefit from its litigation in bad faith. The Court may rule that MDHS had actual knowledge of Zarn's religious beliefs and refused to accommodate, or it may rule on future jury instructions that inform the jury that MDHS had an obligation to find the person whom Cates contacted but MDHS failed to investigate in good faith.

## VI.    CONCLUSION

Zarn's case is strong because Zarn made his religious beliefs and request for accommodation from MDHS's COVID-19 mandate known to MDHS at least three separate times, and at least once he specifically enunciated the religious basis of his concerns. Zarn notified MDHS through Union President Cates, and Cates relayed that MDHS would allow no exemptions based on religion. MDHS's undue burden defense is nonexistent because Zarn's supervisor Bach testified there would have been no burden at

CASE 0:22-cv-01756-MJD-DJF    Doc. 43    Filed 08/28/24    Page 44 of 44

all if Zarn's religious beliefs were accommodated. MDHS ignored Zarn without doing

any sort of financial or practical analysis on how MDHS would be affected by

accommodating Zarn's religious beliefs, which precluded him both from taking the

COVID-19 vaccine and from testing, and if it had done any investigation it would have

found that accommodation cost nothing. Finally, MDHS cannot establish that its

mandatory testing for unvaccinated employees was job-related or a business necessity.

Therefore, MDHS's motion for summary judgment should be denied.


Dated: August 28, 2024                      */s/Gregory M. Erickson*
                                            Gregory M. Erickson, 276522
                                            Benjamin P. Lanari, 0504451
                                            Mohrman, Kaardal & Erickson, P.A.
                                            150 South Fifth Street, Suite 3100
                                            Minneapolis, Minnesota 55402
                                            Telephone: 612-341-1074
                                            Email: erickson@mklaw.com
                                            Email: lanari@mklaw.com
                                            *Attorneys for Plaintiff*